[No. 2,639.]

THE STATE OF CALIFORNIA *v.* THE STEAMSHIP "CONSTITUTION," WILLIAM H. HUDSON, MASTER OF SAID SHIP, THE PACIFIC MAIL STEAMSHIP COMPANY, OWNERS, AND OLIVER ELDRIDGE, CONSIGNEE OF SAID STEAMSHIP.

POWER OF A STATE TO EXCLUDE PAUPERS, ETC., FROM ITS LIMITS.—A State has the power, by proper police and sanitary regulations, to exclude from its limits paupers, vagabonds, and criminals, or sick, diseased, infirm, and disabled persons, who are liable to become a public charge, or to admit them only on such terms as will prevent the State from being burdened with their support.

IDEM.—The exercise of such a power is a police or sanitary regulation for preserving the health and morals of the people.

POWER OF A STATE TO EXCLUDE ABLE-BODIED PERSONS NOT PAUPERS OR CRIMINALS FROM ITS LIMITS.—The power to exclude from the limits of a State, or to admit within its limits upon terms, persons in the full possession of their faculties, sound in body, and neither paupers, vagabonds, or criminals, and in all respects competent to earn a livelihood, is a regulation of commerce, of such a nature that it can be most advantageously exercised by Congress; and a State, even in the absence of legislation by Congress upon the subject, cannot exercise it.

POWER OF A STATE TO REGULATE COMMERCE.—If a regulation of any kind of commerce is local in its character, demanding varying rules, so as to adapt it to particular localities, it is within the province of the State Legislature to adopt such local rules and regulations, in the absence of legislation by Congress on the subject.

APPEAL from the District Court of the Twelfth Judicial District, City and County of San Francisco.

The facts are stated in the opinion.

*McAllisters & Bergin,* for Appellants.

The term "commerce," as used in the Constitution, includes intercourse with foreign nations and between the several States. (*Gibbons* v. *Ogden,* 9 Wheat. 1; *People* v. *Raymond,* 34 Cal. 497.)

The power to regulate commerce includes the power to regulate the transportation of passengers. (*Smith* v. *Turner,* and *Norris* v. *The City of Boston,* 7 How. U. S. 983; id. 401.)

Congress has prescribed regulations for the transportation of passengers, and its action in regard thereto is exclusive. Congress has, from time to time, prescribed all the regulations deemed necessary for the transportation of passengers. The number of persons, extent of accommodation, character and treatment of passengers, are all matters that it has already fully regulated. The "wearing apparel in actual use, and other personal effects (not merchandise), professional books, implements, instruments, and tools of trade,

occupation or employment, of persons arriving in the United States " are exempt from duty. (13 United States Statutes at Large, 390; 12 United States Statutes at Large, 3; 10 United States Statutes at Large, 69, 715; 1 Brightly's Dig. p. 373, Sec. 236; 2 Brightly's Dig. p. 159, Sec. 28.) These Acts of Congress indicate the manner and extent to which Congress has deemed it necessary to regulate commerce in this particular.

The Acts of the Legislature upon the point now under consideration cannot be maintained as an exercise of the police power.

Under the police power the State has the right to exclude from its territory all paupers, vagabonds, and fugitives from justice. This results from the inherent right existing in all communities of self-preservation, but this right does not sanction or justify the exclusion of persons who are not vagabonds, paupers, or fugitives from justice. (7 How. U. S. 426, 427; *Crandall* v. *The State of Nevada*, 6 Wallace, 48.)

*H. H. Byrne, District Attorney of San Francisco, T. W. Freelon*, and *Jo. Hamilton, Attorney General*, for Respondent.

The law in question is a regulation of internal police. The bond required, or the commutation money under it, are neither of them a duty, nor are the alien passengers named in the complaint imports. An import is an article upon which a duty may be levied. The duty is specific or *ad valorem*. (*Brown* v. *Maryland*, 12 Wheaton, 437.) Commerce does not mean anything that is not connected with buying or selling. (7 How. U. S. 416.) Congress has not legislated upon the subject before the Court, and until it does so the States under their reserved power can do so. (*Gilman* v. *Philadelphia*, 3 Wallace, 713; *Steamship Co.* v. *Port Wardens of New Orleans*, 6 Wallace, 31; *Steamship Co.* v. *Joliffe*, 2 Wallace, 450.)

By the Court, CROCKETT, J.:

This is an action against an American passenger vessel, built, owned, and registered at the port of New York, and engaged in the passenger trade between the ports of San Francisco, in this State, and of Panama, in the Republic of New Granada, to enforce the collection of certain forfeitures alleged to have been incurred for the violation of the provisions of an Act of the Legislature of this State, entitled "An Act concerning passengers arriving in the ports of the State of California," approved May 3d, 1852 (Stats. 1852, p. 78), as amended by the Act of April 2d, 1853 (Stats. 1853, p. 71.)   The Act provides, in substance, that the master of any vessel arriving at the port of San Francisco from any port out of this State shall make to the Commissioner of Emigrants a report in writing, duly verified, stating the name, place of birth, time and place of naturalization, last residence, age, and occupation of every person or passenger who shall have landed from such vessel on her last voyage to such port, not being a citizen of the United States, and who shall have, within the last preceding twelve months, arrived from any country out of the United States, at any place within the United States, and who shall not have been bonded, or who have paid the commutation money, according to the provisions of this Act or any former Act.   The master is also required to state in said report if any of said passengers or persons so reported are lunatic, idiot, deaf, dumb, blind, crippled, or infirm; and if so, whether they are accompanied by any relatives likely to be able to support them, and also whether any of said passengers are persons convicted of any infamous crime, or of a felony, so far as the same may be within the knowledge of said master.   Certain penalties are imposed on the master for his failure to make the required report, or for making a false report.   It is then made the duty of the Mayor, on receiving said report,

to require, by his indorsement thereon, that the owner or consignee of the vessel shall give a joint and several bond, with two sureties, in the sum of five hundred dollars, for each and every passenger included in such report, conditioned to indemnify and save harmless each and every county, town, or city in this State, and also the Trustees of the several State hospitals, against all costs and expenses which may be by them, or any of them, necessarily incurred for the relief, support, or medical care of the persons named in the bond, within two years from the date of such bond, or in lieu of sureties, the bond may be secured by a mortgage on real estate, or by a deposit of bonds of the United States or of this State. The sureties are required to justify as to their sufficiency, and a fee is to be paid by the owner or consignee for the justification. A separate bond with separate sureties is required for each passenger; but, in lieu of the bond, the owner or consignee may commute therefor by paying five dollars in cash for each passenger included in said report. It is further provided that whenever, in the opinion of such Mayor, there be among the passengers in any vessel any lunatic, idiot, deaf, dumb, cripple, or infirm person not members of families, or who, from attending circumstances are likely to become permanently a public charge, or who have been paupers in any other country, or who from sickness or disease existing either at the time of departure from the port of departure, or at the time of their arrival in any part of this State, are a public charge, or likely soon to become so, it shall be the duty of such Mayor to require in the indorsement made according to section two of this Act, or in any subsequent indorsement or indorsements, in addition to the bond provided for in section two, that the owner or consignee of such vessel shall execute for every such passenger a further bond, joint and several, to the people of this State, in the sum of one thousand dollars.

Such bond shall be conditioned and secured in the man-

ner already stated.   If any person for whom a bond is given shall, within the period specified in the bond, become a charge upon any city, town, or county in this State, or upon either of the State hospitals, suit may be brought on the bond, and a recovery had for such sum as was expended in the care or support of the person named in the bond; and all moneys received for commutation are to be paid into the State Treasury, into the Hospital Fund, and to be applied exclusively towards the support of State hospitals.

The Act further provides that in lieu of the bond for blind, deaf and dumb, cripples, or other disabled persons, the owner or consignee may commute by the payment of such sum as the Commissioner of Emigrants shall deem reasonable.

The complaint alleges that on a voyage from Panama to San Francisco the steamship Constitution brought as passengers, and landed at the latter port, four persons as passengers who were natives and citizens of New Granada; that the Master on his arrival duly made his report to the Commissioner of Emigrants, including therein the names of the four passengers aforesaid, and that the Mayor, by his indorsement on said report, had duly required bonds to be given for those passengers, as required by the statute; but that neither the owner or consignee had given the required bond or paid the requisite commutation money, and had refused either to give the bond or pay the commutation.   The statute declares that all forfeitures incurred under the Act by the owner or consignee shall be a lien upon the vessel, to be enforced by a proceeding *in rem,* and the action is brought to enforce this lien.   The answer admits that the passengers were brought and landed as charged in the complaint, and that they were natives and citizens of New Granada, and avers that they were taken on board as passengers in the ordinary course of the business of the vessel, and that when landed in San Francisco they were persons in the prime of life, in the full possession of their faculties, perfectly sound in body and mind,

neither paupers, vagabonds, or criminals, and in all respects competent to earn a livelihood. The Court sustained a demurrer to the answer, and the defendant declining to amend, a final judgment was entered for the plaintiff, from which the defendant appeals. The only question presented for our decision is, whether or not so much of the statute as requires a bond to be given or commutation money to be paid on the passengers described in the answer is in violation of the Constitution of the United States, and therefore void. The Act is claimed to be repugnant to that portion of Article I, section eight, of the Federal Constitution, which provides that Congress shall have the power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," and to that portion of section ten of the same Article which provides that "no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

In considering the grave question here presented, it is to be observed *in limine,* that whatever may have been the real purpose of the statute, its ostensible purpose was to provide police and sanitary regulations, to prevent the people of this State from becoming chargeable with the support and maintenance of persons imported from foreign countries, who either then were, or were soon after, liable to become a public charge. If it were conceded that this was the real purpose of the statute, and that its provisions are reasonably adapted, and were intended to secure this result, and this only, there would be an end to the argument; for in all the numerous adjudications which have been had in respect to the power of the several States to interfere with commerce under the clauses of the Constitution above referred to, it has never been doubted that a State has the power, by proper police and sanitary regulations, to exclude from its limits paupers, vagabonds, and criminals, or sick, diseased,

infirm, and disabled persons, who were liable to become a public charge, or to admit them only on such terms as would prevent the State from being burdened with their support. To surrender this power would be to abandon one of the highest prerogatives of local self-government, one of the chief functions of which is to preserve the public health and to repress crime. In this respect the statute under consideration differs widely from that which we had occasion to consider in *People* v. *Raymond*, 34 Cal. 495. The statute discussed in that case was designed solely for revenue purposes, and was intended to raise revenue for the support of the State Government from a stamp tax, imposed on passenger contracts with persons about to depart from this State on passenger vessels. We held this to be a regulation of commerce, within the meaning of section eight, Article I, of the Federal Constitution, and that Congress having legislated on the same subject, by requiring a Federal revenue stamp to be affixed to all passenger contracts, its authority was paramount, and when exercised excluded all State legislation on the same subject. We, therefore, held the statute to be void. But we did not decide whether or not, in the absence of legislation by Congress on the same subject, the State would have had the constitutional power to enact the statute which was considered in that case. But whilst conceding the authority of the State to enact police and sanitary regulations for preserving the health and morals of the people, counsel insists that this statute is neither the one or the other, so far as it operates upon persons who at the time of landing are neither paupers, vagabonds, or criminals, or affected with any mental or bodily infirmity, but on the contrary are perfectly sound in body and mind, and in every way fitted to earn a support. It is said that police and sanitary regulations can have no just application to persons of

CAL. REPS. XLII—74

this description, and that it is an abuse of terms to say that they are proper subjects for such regulations, because, possibly, they may at some future day become paupers, vagabonds, or criminals, or sick, infirm, or otherwise disabled. This view of the question appears to me to be unanswerable. It is a misnomer to call that a police regulation, in the sense in which that term is here applied, in so far as it operates upon persons of good morals and upright character, and who are not more likely than the average of mankind to become paupers, vagabonds, or criminals; and it is equally a misnomer to term that a sanitary regulation which applies only to persons in good health and of sound mind, and who are not more liable than other people hereafter to become a public charge from sickness or infirmity. The power to make police or sanitary regulations prescribing the terms on which certain classes of persons shall be admitted into this State, necessarily includes the power to exclude them altogether if they fail to comply with the prescribed conditions. If a criminal from a penal colony should be required to pay one hundred dollars upon his entrance into this State, he might be excluded altogether, if he refused to pay the required sum, or a pauper from a foreign almshouse might be refused permission to land in this State on any terms, or might be received on such conditions as the State may prescribe. These would be merely police regulations, in the proper and just sense of that term. But if the State, under the pretense of police or health regulations, should enact that no person should hereafter enter this State, unless he would first pay a sum of money, or give a bond, with sureties, for his future good behavior, or conditioned that he would not become a public charge during his sojourn in this State, this could in no just sense be termed a police or sanitary regulation, in so far as it would be applicable to persons of good character and morals, and who were sound in body and mind. If the State could exercise such a power as this

under the pretense of preserving the public health and morals, it is obvious that it might destroy the entire passenger traffic between this State and foreign countries, and even with our sister States. It might, for the same reason, prohibit the importation of all merchandise from foreign countries, for fear that it might be infected with some secret cause of disease which in the future might possibly damage the health of the community. Whilst the Legislature may exercise a wide discretion as to the proper subjects for police and sanitary regulations, and as to the proper mode of preserving the health and morals of the community, by means of these regulations, it cannot, under color of this power, enact laws which in no proximate degree are germain to the subject. I am, therefore, of opinion that a statute which obstructs the entrance into this State of persons who are neither paupers, vagabonds, or criminals, or in anywise unsound or infirm in body or mind, is not an exercise of the police power of the State, in any just sense of that term.

Assuming these conclusions to be correct, and that the statute in question is not a police or sanitary regulation, as applied to these passengers, it remains to be considered whether it is not, nevertheless, a valid enactment. Conceding it to be a regulation of commerce between this State and foreign nations, the grave question arises whether it was within the constitutional power of the Legislature to enact it. There is, perhaps, no question of constitutional construction which has been so elaborately discussed by the highest Courts in this country as that which relates to the power of Congress, and of the several States respectively, in regulating commerce with foreign nations. Whatever doubts may originally have existed in respect to the concurrent power of Congress and the several States over this subject, it is now well settled that when Congress undertakes, by its legislation, to regulate a particular branch of our foreign commerce, its authority in this respect is para-

mount, and is exclusive of all action by the several States on that particular subject. (*People* v. *Raymond, supra,* and cases there cited.) But it has long remained a doubtful question, of the gravest import, whether or not, in the absence of legislation on the same subject by Congress, a State might not legislate for itself in respect to its commerce with foreign nations. This question was elaborately reviewed by the eminent jurists who then composed the Supreme Court of the United States, in what are known as *The Passenger Cases,* 7 How. 283. In the very able opinions which were delivered by the several members of the Court in these cases the argument on this question was apparently exhausted; and yet, notwithstanding the great learning and ability which characterizes them, so voluminous are these opinions, and so great the variety of topics discussed, that it is not easy to determine what was the precise result reached by a majority of the Court on this particular point. A similar doubt as to the result of these conflicting opinions, on this point, appears to have been entertained by the same Court in the late case of *Crandall* v. *State of Nevada,* 6 Wall. 35. In delivering the opinion of the Court in that case, Mr. Justice Miller says:

"The proposition that the power to regulate commerce, as granted to Congress by the Constitution, necessarily excludes the exercise by the States of any of the power thus granted, is one which has been much considered in this Court, and the earlier discussions left the question in much doubt. As late as the January Term, 1849, the opinions of the Judges in *The Passenger Cases* show that the question was considered to be one of much importance in those cases, and was even then unsettled, though previous decisions of the Court were relied on by the Judges themselves as deciding it in different ways. It was certainly, so far as those cases affected it, left an open question.

" In the case of *Cooley* v. *Board of Wardens,* four years later, the same question came directly before the Court in reference to the local laws of the port of Philadelphia concerning pilots.   It was claimed that they constituted a regulation of commerce, and were therefore void.   The Court held that they did come withing the meaning of the term ' to regulate commerce,' but that, until Congress made regulations concerning pilots, the States were competent to do so.

" Perhaps no more satisfactory solution has ever been given of this vexed question than the one furnished by the Court in that case.

" After showing that there are some powers granted to Congress which are exclusive of similar powers in the States, because they are declared to be so, and that other powers are necessarily so from their very nature, the Court proceeds to say that the authority to regulate commerce with foreign nations and the States includes within its compass powers which can only be exercised by Congress, as well as powers which, from their nature, can best be exercised by the State Legislatures—to which latter class the regulation of pilots belongs.   ' Whatever subjects of this power are in their nature national, or admit of one uniform system or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress.'

" In the case of *Gilman* v. *Philadelphia* this doctrine is reaffirmed, and, under it, a bridge across a stream navigable from the ocean, authorized by State law, was held to be well authorized, in the absence of any legislation by Congress affecting the matter."

The proposition here announced is, that when a regulation of our foreign commerce is national in its character— that is to say, when it is of such a nature that the power to

enact it can be most advantageously and appropriately exercised by Congress under a general system, applicable alike to the whole nation and all its parts, then Congress has the exclusive power to legislate upon it, and the States, severally, have no power to deal with it. But, if the regulation be local in its nature, and demanding varying rules, so as to adapt it to particular localities, it is within the province of the State Legislatures to adopt such local rules and regulations, in the absence of legislation by Congress, on that particular subject. This must be accepted as the latest expression of opinion, on this vexed question, by our highest judicial tribunal, to whose authority it is our duty to defer in its construction of the Constitution of the United States. Tested by this rule, the statute under discussion is, in my opinion, unconstitutional.

It seeks to apply to emigrants from foreign countries, landing on our shores, onerous conditions not exacted from them at other of our domestic ports, and not imposed upon them by any Act of Congress. The regulation is not local in its nature or character, and, if Congress deemed it wise to do so, could as well be enforced at the port of New York, or any other of our great ports, as at San Francisco. Congress having omitted to establish such regulations, and to impose such burdens on foreign emigrants, the presumption is that it deems it unwise or impolitic to do so. But, however this may be, under the construction given to the Federal Constitution in *Crandall* v. *State of Nevada*, Congress has the exclusive power to establish such regulations as these.

Judgment reversed and cause remanded, with an order to the District Court to overrule the demurrer to the answer.