## COMPAGNIE FRANCAISE DE NAVIGATION A VAPEUR *v.* LOUISIANA STATE BOARD OF HEALTH.

ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA.

No. 4. Argued October 29, 30, 1900.—Affirmed June 2, 1902.

The law of Louisiana under which the Board of Health exerted the authority complained of in this case, is found in section 8 of Act 192 of 1898. The Supreme Court of Louisiana, interpreting this statute held that it empowered the board to exclude healthy persons from a locality infested with a contagious or infectious disease, and that this power was intended to apply as well to persons seeking to enter the infected place, whether they came from without or within the State. *Held:* That this empowered the board to exclude healthy persons from a locality infested with a contagious or infectious disease, and that the power was intended to apply as well to persons seeking to enter the infected place, whether they came from without or within the State.

THIS action was commenced in the state court against the Board of Health of the State of Louisiana and three persons who were members of said board, and whom it was sought to hold individually responsible for damages alleged to have been suffered from the enforcement of a resolution adopted by the board upon the theory that the resolution referred to was *ultra vires* and hence the members of the board who voted for it

were personally liable for any damages occasioned by the enforcement of the resolution. The board was thus described in the petition:

"That the defendant The State Board of Health was a body created by Act No. 192 of the General Assembly of the State of Louisiana of the year 1898, with power to sue and be sued, domiciled in this city, (the city of New Orleans,) and composed of seven members, whose duty it was, by the provisions of said act, to protect and preserve the public health by preparing and promulgating a sanitary code for the State of Louisiana, by providing for the general sanitation of the State, and with authority to regulate infectious and contagious diseases and to prescribe a maritime and land quarantine against places infected with such diseases."

It was asserted that the plaintiff, a corporation created by and existing under the laws of the Republic of France and a citizen of said republic, on or about September 2, 1898, caused its steamship Britannia to be cleared from the ports of Marseilles, France, and Palermo, Italy, for New Orleans with a cargo of merchandise and with about 408 passengers, some of whom were citizens of the United States returning home, and others who were seeking homes in the United States, and who intended to settle in the State of Louisiana or adjoining States, and that all the passengers referred to at the time of their sailing were free from infectious or contagious diseases. It was further averred that on September 29, 1898, the vessel arrived at the quarantine station some distance below the city of New Orleans, was there regularly inspected, and was found both as to the passengers and cargo to be free from any infectious or contagious disease, and accordingly was given a clean bill of health, whereby the ship became entitled to proceed to New Orleans and land her passengers and discharge her cargo. This, however, it was asserted she was not permitted to do, because, on the date last mentioned, at a meeting held by the Board of Health, the following resolution was adopted:

"Resolved, That hereafter in the case of any town, city or parish of Louisiana being declared in quarantine, no body or bodies of people, immigrants, soldiers or others shall be allowed

to enter said town, city or parish so long as said quarantine shall exist, and that the president of the board shall enforce this resolution."

It was charged that in order to enforce this resolution the president of the Board of Health, who was one of the individual defendants, instructed the quarantine officer to detain the Britannia at the quarantine station, and the president of the board addressed to the agent of the steamship the following communciation explanatory of the detention of the vessel:

"Referring to the detention of the SS. Britannia at the Mississippi River quarantine station, with 408 Italian immigrants on board, I have to inform you that under the provisions of the new state Board of Health law, section 8, of which I enclose a marked copy, this board has adopted a resolution forbidding the landing of any body of people in any town, city or parish in quarantine. Under this resolution the immigrants now on board the Britannia cannot be landed in any of the following parishes of Louisiana, namely: Orleans, St. Bernard, Jefferson (right bank), St. Tammany, Plaquemines, St. Charles or St. John. You will therefore govern yourselves accordingly."

The president of the Board of Health, it was alleged, moreover notified the agent of the ship that if an attempt was made to land the passengers at any place contiguous to New Orleans, such place not being in quarantine, a quarantine against such place would be declared, and thus the landing be prevented.

It was averred that whilst the resolution of the Board of Health purported on its face to be general in its operation, in truth it was passed with the sole object of preventing the landing of the passengers from the Britannia, and this was demonstrated because no attempt was made by the Board of Health to enforce the provisions of the resolution against immigrants from Italy coming into the United States via the port of New York and thence reaching New Orleans by rail, and that after the promulgation of said resolution " more than 200 such persons, varying in groups of 30 to 100 in number, have from time to time been permitted to enter said city." It was averred that the action of the board was not authorized by the state

law, and if it was, such law was void because repugnant to the provision of the Constitution of the United States conferring upon Congress power " to regulate commerce with foreign nations, and among the several States and with the Indian tribes." Averring that damage had been already entailed to the extent of $2500, for which not only the board but its members who voted for the resolution were liable, and reserving the right to claim such future damage as might be entailed by the further enforcement of the resolution, the petition asked for an injunction restraining the enforcement of the resolution in question, and prayed judgment against the board and the members named for $2500 *in solido*.

The court declined to allow a preliminary restraining order, and upon a hearing on a rule to show cause, the injunction was refused. The order of the Board of Health, which was complained of, continued, therefore, to be enforced against the ship. Subsequently the plaintiff filed a supplemental and amended petition. It was reiterated that the immigrant passengers on board the Britannia were free from disease when they shipped and at the time of their arrival, and, in addition, it was alleged that the steamer with the immigrants on board had sailed from her port of departure " prior to the declaration by said Board of Health of the existence of any infectious disease in the city of New Orleans." It was alleged that, in consequence of the insistence of the Board of Health and its members, in enforcing the illegal order refusing to allow the landing of the immigrant passengers, the steamer had been obliged to proceed to Pensacola, Florida, where they were landed, and then the steamer returned to New Orleans for the purpose of discharging cargo. The damage resulting was averred to be $8500, besides the $2500 previously claimed, and a judgment for this amount, in addition to the previous sum, was also asked *in solido* against the board and the members thereof, who were individually made defendants. It was, moreover, averred that the action of the board was " in violation of the laws of the United States, and the rules and regulations made in pursuance thereof, relating to quarantine and immigration from foreign countries into ports of the United States, and especially acts of Congress ap-

proved February 15, 1893, and acts of Congress of March the 3d, 1893, August the 3d, 1872, and June the 26th, 1884, and the rules and regulations made in pursuance thereof, and of the treaties now existing between the United States, on the one part, and the Kingdom of Italy and the Republic of France on the other part."

The defendants filed a peremptory exception of no cause of action, which was sustained by the trial court, and the suit was therefore dismissed. On appeal to the Supreme Court of the State of Louisiana the judgment of the trial court was affirmed. 51 La. Ann. 645.

*Mr. W. B. Spencer* for plaintiff in error. *Mr. W. W. Howe* was on his brief.

*Mr. F. C. Zacharie* for defendant in error.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

The law of Louisiana, under which the Board of Health exerted the authority which is complained of, is found in section 8 of Act No. 192, enacted in 1898. The portion of the section which is essential is as follows, the provision which is more directly pertinent to the case in hand being italicized :

"In case that any parish, town or city, or any portion thereof, shall become infected with any contagious or infectious disease, to such an extent as to threaten the spread of such disease to the other portions of the State, the state Board of Health shall issue its proclamation declaring the facts and ordering it in quarantine, and shall order the local boards of health in other parishes, towns and cities to quarantine against said locality, and shall establish and promulgate the rules and regulations, terms and conditions on which intercourse with said infected locality shall be permitted, and shall issue to the other local sanitary authorities instructions as to the measures adopted in quarantining against persons, goods or other property coming from said infected localities, and these rules and regulations,

terms and conditions shall be observed and obeyed by all other health authorities, provided that should any other of the non-infected portion of the State desire to add to the regulations and rules, terms and conditions already imposed by the state board, they do so on the approval of the state Board of Health. *The state Board of Health may, in its discretion, prohibit the introduction into any infected portion of the State, persons acclimated, unacclimated or said to be immune, when in its judgment the introduction of such persons would add to or increase the prevalence of the disease.* The state Board of Health shall render the local boards of health all the assistance in their power and which the condition of their finances will permit."

The Supreme Court of the State of Louisiana, interpreting this statute, held that it empowered the board to exclude healthy persons from a locality infested with a contagious or infectious disease, and that this power was intended to apply as well to persons seeking to enter the infected place, whether they came from without or from within the State. The court said :

"The law does not limit the board to prohibiting the introduction of persons from one portion of the State to another and an infected portion of the State, but evidently looked as well to the prohibition of the introduction of persons from points outside of the State into any infected portion of the State. As the object in view would be ' to accomplish the subsidence and suppression of the infectious and contagious diseases and to prevent the spread of the same,' it would be difficult to see why parties from outside of the State should be permitted to enter into infected places, while those from the different parishes should be prevented from holding intercourse with each other.

" The object in view was to keep down, as far as possible, the number of persons to be brought within danger of contagion or infection, and by means of this reduction to accomplish the subsidence and suppression of the disease and the spread of the same.

" The particular places from which the parties, who were to be prohibited from entering the infected district or districts, came could have no possible influence upon the attainment of the result sought to be attained.

" It would make no possible difference whether this ' added fuel ' sought to be excluded should come from Louisiana, New York or Europe."

Referring to past conditions and the public dangers which had arisen from them, the evil which the statute of 1898 was intended to remedy was pointed out as follows :

" During the fall of 1897, and during the existence of an epidemic, a vessel arrived in the Mississippi River with emigrants aboard under conditions similar to those under which the Britannia reached the same stream in 1898.

" The excited public discussions at the time as to the right of the state board, under the then existing law, to prevent the landing of the emigrants and as to its duty in the premises, were so extended as to authorize us to take judicial notice of the fact, and in our opinion the clause in the present act which covers that precise matter was inserted therein for the express purpose of placing the particular question outside of the range of controversy.

" For a number of years past emigrants have been coming into New Orleans in the autumn from Italy.

" There was a probability when the general assembly met in 1898 that the epidemic of 1897 might be repeated, and a great probability that emigrants would seek to enter, as they had done the year before, to the great danger, not only of the people of Louisiana, but of the emigrants themselves.

" Independently of this, there was great danger to be apprehended from the increasing intercourse between New Orleans and the West India Islands in consequence of a war with Spain.

" It was to ward off these dangers that this particular provision was inserted in the act of 1898."

And by implication from the reasoning just referred to the existence of the conditions rendering it necessary to call the power into play in the case before it was recognized. Thus construing the statute, the state court held that it was not repugnant to the Constitution of the United States and was not in conflict with any law or treaty of the United States. These latter considerations present the questions which arise for our decision. All the assignments of error relied upon to show the

invalidity of the statute of the State of Louisiana, and hence the illegality of the action of the Board of Health from the point of view of Federal considerations, are, in the argument at bar, summarized in four propositions. We shall consider them separately and thus dispose of the case. In doing so, however, as the first and second contentions both rest upon the assertion that the statute violates the Constitution of the United States, we shall treat them together.

" First. The statute drawn in question, on its face and as construed and applied, is void for the reason that it is in violation of article I, section 3, paragraph 8, of the Constitution of the United States, inasmuch as it vests authority in the state Board of Health, in its discretion, to interfere with or prohibit interstate and foreign commerce.

" Second. The statute is void for inasmuch as it is in conflict with section 1 of the fourteenth article of amendment to the Constitution of the United States, in that it deprives the plaintiff of its liberty and property without due process of law, and denies to it the equal protection of the law."

That from an early day the power of the States to enact and enforce quarantine laws for the safety and the protection of the health of their inhabitants has been recognized by Congress, is beyond question. That until Congress has exercised its power on the subject, such state quarantine laws and state laws for the purpose of preventing, eradicating or controlling the spread of contagious or infectious diseases, are not repugnant to the Constitution of the United States, although their operation affects interstate or foreign commerce, is not an open question. The doctrine was elaborately examined and stated in *Morgan Steamship Company* v. *Louisiana Board of Health*, 118 U. S. 455. That case involved determining whether a quarantine law enacted by the State of Louisiana was repugnant to the commerce clause of the Constitution because of its necessary effect upon interstate and foreign commerce. The court said:

" Is the law under consideration void as a regulation of commerce? Undoubtedly it is in some sense a regulation of commerce. It arrests a vessel on a voyage which may have been a long one. It may affect commerce among the States when

the vessel is coming from some other State of the Union than Louisiana, and it may affect commerce with foreign nations when the vessel arrested comes from a foreign port. This interruption of the voyage may be for days or for weeks. It extends to the vessel, the cargo, the officers and seamen, and the passengers. In so far as it provides a rule by which this power is exercised, it cannot be denied that it regulates commerce. We do not think it necessary to enter into the inquiry whether, notwithstanding this, it is to be classed among those police powers which were retained by the States as exclusively their own, and, therefore, not ceded to Congress. For, while it may be a police power in the sense that all provisions for the health, comfort and security of the citizens, are police regulations, and an exercise of the police power, it has been said more than once in this court that, even where such powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail. *Gibbons* v. *Ogden,* 9 Wheat. 1, 210; *Henderson* v. *The Mayor,* 92 U. S. 259, 272; *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650, 661.

"But it may be conceded that whenever Congress shall undertake to provide for the commercial cities of the United States a general system of quarantine, or shall confide the execution of the details of such a system to a National Board of Health, or to local boards, as may be found expedient, all state laws on the subject will be abrogated, at least so far as the two are inconsistent. But, until this is done, the laws of the State on the subject are valid. This follows from two reasons :

"1. The act of 1799, the main features of which are embodied in Title LVIII of the Revised Statutes, clearly recognizes the quarantine laws of the States, and required of the officers of the Treasury a conformity to their provisions in dealing with vessels affected by the quarantine system. And this very clearly has relation to laws created after the passage of that statute, as well as to those then in existence; and when, by the act of April 29, 1878, 20 Stat. 37, certain powers in this direction were conferred on the Surgeon General of the Marine Hospital Service, and consuls and revenue officers were required to contrib-

ute services in preventing the importation of disease, it was provided that 'there shall be no interference in any manner with any quarantine laws or regulations as they now exist or may hereafter be adopted under state laws,' showing very clearly the intention of Congress to adopt these laws or to recognize the power of the States to pass them.

"2. But, aside from this, quarantine laws belong to that class of state legislation which, whether passed with intent to regulate commerce or not, must be admitted to have that effect, and which are valid until displaced or contravened by some legislation of Congress."

Again, in *Louisiana* v. *Texas*, 176 U. S. 1, 21, the court was called upon to consider a quarantine law of the State of Texas which by its terms was applicable to and was enforced as to both interstate and foreign commerce. After referring approvingly to the case which we have above cited, the court, speaking through Mr. Chief Justice Fuller, said:

"It is not charged that this statute is invalid nor could it be if tested by its terms. While it is true that the power vested in Congress to regulate commerce among the States is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution, and that where the action of the States in the exercise of their reserve powers comes into collision with it, the latter must give way; yet it is also true that quarantine laws belong to that class of state legislation which is valid until displaced by Congress, and that such legislation has been expressly recognized by the laws of the United States almost from the beginning of the government."

Further, in calling attention to the fact, as remarked by the court in *Morgan Steamship Company* v. *Louisiana Board of Health, supra*, that in the nature of things quarantine laws and laws relating to public health must necessarily vary with the different localities of the country, it was said:

"Hence even if Congress had remained silent on the subject it would not have followed that the exercise of the police power of the State in this regard, although necessarily operating on interstate commerce, would be therefore invalid. Although from the nature and subjects of the power of regulating com-

merce it must be ordinarily exercised by the national government exclusively, this has not been held to be so where in relation to the particular subject-matter different rules might be suitable in different localities. At the same time, Congress could by affirmative action displace the local laws, substitute laws of its own, and thus correct any unjustifiable and oppressive exercise of power by state legislation."

Despite these conclusive adjudications, it is earnestly insisted in the argument at bar that by a correct appreciation of all the decisions of this court on the subject, the rule will be discovered to be that the States may enact quarantine or other health laws for the protection of their inhabitants, but that such laws, if they operate upon or directly affect interstate or foreign commerce, are repugnant to the Constitution of the United States independently of whether Congress has legislated on such subjects. To sustain this contention a most copious reference is made to many cases decided by this court, where the nature and extent of the power of Congress to regulate commerce was considered and the validity of state legislation asserted to be repugnant to such power was passed upon. To analyze and review the numerous cases referred to in order to point out their want of relation to the question in hand, would involve in effect a review of the whole subject of the power of Congress to regulate commerce in every possible aspect, and an analysis of practically the greater body of cases which have in this court involved that serious and difficult subject from the beginning. We shall not undertake to do so, but content ourselves with saying, after duly considering the cases relied upon, that we find them inapposite to the doctrine they are cited to sustain, and hence, when they are correctly appreciated, none of them conflict with the settled rule announced by this court in the cases to which we have referred.

The confusion of thought which has given rise to the misconception of the authorities relied upon in the argument, and which has caused it to be supposed that they are apposite to the case in hand, is well illustrated by the premise upon which the proposition that the cited authorities are applicable rests. That proposition is thus stated in the printed argument (italics in the original):

"Turning now to the decisions of this court, it will be found that the basis upon which it has upheld the exclusion, inspection and quarantine laws of various States, is that criminals, diseased persons and things, and paupers, *are not legitimate subjects of commerce.* They may be attendant evils, but they are not legitimate subjects of traffic and transportation, and therefore, in their exclusion or detention, the State is not interfering with *legitimate* commerce, which is the only kind entitled to the protection of the Constitution."

But it must be at once observed that this erroneously states the doctrine as concluded by the decisions of this court previously referred to, since the proposition ignores the fact that those cases expressly and unequivocally hold that the health and quarantine laws of the several States are not repugnant to the Constitution of the United States, although they affect foreign and domestic commerce, as in many cases they necessarily must do in order to be efficacious, because until Congress has acted under the authority conferred upon it by the Constitution, such state health and quarantine laws producing such effect on legitimate interstate commerce are not in conflict with the Constitution. True is it that, in some of the cases relied on in the argument, it was held that a state law absolutely prohibiting the introduction, under all circumstances, of objects actually affected with disease, was valid because such objects were not legitimate commerce. But this implies no limitation on the power to regulate by health laws the subjects of legitimate commerce. In other words, the power exists until Congress has acted, to incidentally regulate by health and quarantine laws, even although interstate and foreign commerce is affected, and the power to absolutely prohibit additionally obtains where the thing prohibited is not commerce, and hence not embraced in either interstate or foreign commerce. True, also, it was held in some of the cases referred to by counsel, that where the introduction of a given article was absolutely prohibited by a state law upon the asserted theory that the health of the inhabitants would be aided by the enforcement of the prohibition, it was decided that, as the article which it was thus sought to prohibit, was a well-known article of commerce, and there-

fore the legitimate subject of interstate commerce, it could not be removed from that category by the prohibitive effect of state legislation. But this case does not involve that question, since it does not present the attempted exercise by the State of the power to absolutely prohibit the introduction of an article of commerce, but merely requires us to decide whether a state law, which regulates the introduction of persons and property into a district infested with contagious or infectious diseases, is void, because to enforce such regulation will burden interstate and foreign commerce, and therefore violate the Constitution of the United States. It is earnestly insisted that the statute, whose constitutionality is assailed, is, on its face, not a regulation, but án absolute prohibition against interstate commerce, and it is sought to sustain this contention by various sug" estions as to the wrong which may possibly arise from a perversiȯn and an abuse by the state authorities of the power which the statute confers. Thus it is said, what is an infectious and contagious disease is uncertain, and involves a large number of maladies. How many cases of such malady are essential to cause a place to be considered as infected with them is left to the determination of the Board of Health. That board, it is argued, may then arbitrarily, upon the existence of one or more cases of any malady which it may deem to be infectious or contagious, declare any given place in the State, or even the whole State of Louisiana, infected, and proceed to absolutely debar all interstate or foreign commerce with the State of Louisiana. True it is, as said in *Morgan* v. *Louisiana, ubi sup.*:

"In all cases of this kind it has been repeatedly held that, when the question is raised whether the state statute is a just exercise of state power or is intended by roundabout means to invade the domain of Federal authority, this court will look into the operation and effect of the statute to discern its purpose. See *Henderson* v. *Mayor of New York,* 92 U. S. 259; *Chy Lung* v. *Freeman,* 92 U. S. 275; *Cannon* v. *New Orleans,* 20 Wall. 587."

But this implies that we are to consider the statute as enacted and the natural results flowing from it. It does not import that we are to hold a state statute unconstitutional by indulging in

conjecture as to every conceivable harm which may arise or wrong which may be occasioned by the abuse of the lawful powers which a statute confers. It will be time enough to consider a case of such supposed abuse when it is presented for consideration. And it is also to be borne in mind, as said by this court in *Louisiana* v. *Texas, supra,* 22, if any such wrong should be perpetrated "Congress could by affirmative action displace the local laws, substitute laws of its own, and thus correct any unjustifiable and oppressive exercise of power by state legislation." And the views which we have previously expressed suffice to dispose of the contention that the subjecting of the vessel of the plaintiff in error to the restriction imposed by the quarantine and health law of the State operated to deprive the defendant in error of its property without due process of law, in violation of the Fourteenth Amendment. It having been ascertained that the regulation was lawfully adopted and enforced the contention demonstrates its own unsoundness, since in the last analysis it reduces itself to the proposition that the effect of the Fourteenth Amendment was to strip the government, whether state or national, of all power to enact regulations protecting the health and safety of the people, or, what is equivalent thereto, necessarily amounts to saying that such laws when lawfully enacted cannot be enforced against person or property without violating the Constitution. In other words, that the lawful powers of government which the Constitution has conferred may not be exerted without bringing about a violation of the Constitution.

"Third. The statute as applied and construed is void, for the reason that it is in conflict with treaties between the United States on the one part and the Republic of France and the Kingdom of Italy on the other part, guaranteeing certain rights, privileges and immunities to the citizens and subjects of said countries."

Reliance is placed to sustain this proposition, on the provisions of a treaty concluded with the Kingdom of Italy on February 26, 1871; on the terms of a treaty with Great Britain of July 3, 1815, as also a treaty between the United States and the Kingdom of Greece, concluded December 22, 1837, and one con-

cluded with the Kingdom of Sweden and Norway on July 24, 1827. The treaties of other countries than Italy are referred to upon the theory that as by the treaty concluded with France on April 3, 1803, by which Louisiana was acquired, it was provided that France should be treated upon the footing of the most favored nation in the ports of the ceded territory, therefore the treaties in question made with other countries than France were applicable to the plaintiff in error, a French subject.

. Conceding, *arguendo*, this latter proposition, and therefore assuming that all the treaties relied on are applicable, we think it clearly results from their context that they were not intended to and did not deprive the government of the United States of those powers necessarily inhering in it and essential to the health and safety of its people. We say the United States, because if the treaties relied on have the effect claimed for them that effect would be equally as operative and conclusive against a quarantine established by the government of the United States as it would be against a state quarantine operating upon and affecting foreign commerce by virtue of the inaction of Congress. Without reviewing the text of all the treaties, we advert to the provisions of the one made with Greece, which is principally relied upon. The text of article XV of this treaty is the provision to which our attention is directed, and it is reproduced in the margin.[1]

---

[1] " Article XV. It is agreed that vessels arriving directly from the United States of America at a port within the dominion of His Majesty the King of Greece, or from the Kingdom of Greece, at a port of the United States of America, and provided with a bill of health granted by an officer having competent power to that effect at the port whence such vessel shall have sailed, setting forth that no malignant or contagious diseases prevailed in that port, shall be subjected to no other quarantine than such as may be necessary for the visit of the health officer of the port where such vessel shall have arrived, after which said vessels shall be allowed immediately to enter and unload their cargoes; Provided always, that there shall be on board no person who, during the voyage, shall have been attacked with any malignant or contagious disease; that such vessel shall not, during the passage, have communicated with any vessel liable itself to undergo quarantine; and that the country whence they came shall not at that time be so far infected or suspected that, before their arrival, an ordinance had been issued in consequence of which all vessels coming from that country should be considered as suspected, and consequently subject to quarantine."

It is apparent that it provides only the particular form of document which shall be taken by a ship of the Kingdom of Greece and reciprocally by those of the United States for the purpose of establishing that infectious or contagious diseases did not exist at the point of departure. But it is plain from the face of the treaty that the provision as to the certificate was not intended to abrogate the quarantine power, since the concluding section of the article in question expressly subjects the vessel holding the certificate to quarantine detention if, on its arrival, a general quarantine had been established against all ships coming from the port whence the vessel holding the certificate had sailed. In other words, the treaty having provided the certificate and given it effect under ordinary conditions, proceeds to subject the vessel holding the certificate to quarantine, if, on its arrival, such restriction had been established in consequence of infection deemed to exist at the port of departure. Nothing in the text of the treaty, we think, gives even color to the suggestion that it was intended to deal with the exercise by the government of the United States of its power to legislate for the safety and health of its people or to render the exertion of such power nugatory by exempting the vessels of the Kingdom of Greece, when coming to the United States, from the operation of such laws. In other words, the treaty was made subject to the enactment of such health laws as the local conditions might evoke not paramount to them. Especially where the restriction imposed upon the vessel is based, not upon the conditions existing at the port of departure, but upon the presence of an infectious or contagious malady at the port of arrival within the United States, which, in the nature of things, could not be covered by the certificate relating to the state of the public health at the port whence the ship had sailed.

"Fourth. The statute as applied is void for the reason that it is in conflict with the laws of the United States relating to foreign immigration into the United States."

In the argument at bar this proposition embraces also the claim that the statute is void because in conflict with the act of Congress of 1893 entitled "An act granting additional quarantine powers and imposing additional duties upon the Marine

Hospital Service." 27 Stat. 449. And that it also is in conflict with the rules and regulations adopted for the enforcement of both the immigration laws and the quarantine law referred to.

The immigration acts to which the proposition relates are those of March 3, 1875, of August 3, 1882, of June 26, 1884, of February 26, 1885, of March 23, 1887, and March 3, 1891, and the regulations to enforce the same. Without undertaking to analyze the provisions of these acts, it suffices to say that, after scrutinizing them, we think they do not purport to abrogate the quarantine laws of the several States, and that the safeguards which they create and the regulations which they impose on the introduction of immigrants are ancillary, and subject to such quarantine laws. So far as the act of 1893 is concerned, it is manifest that it did not contemplate the overthrow of the existing state quarantine systems and the abrogation of the powers on the subject of health and quarantine exercised by the States from the beginning, because the enactment of state laws on these subjects would, in particular instances, affect interstate and foreign commerce. An extract from section 3 of the act, which we think makes these conclusions obvious, is reproduced in the margin.[1]

---

[1] "SEC. 3. That the Supervising Surgeon General of the Marine Hospital Service shall, immediately after this act takes effect, examine the quarantine regulations of all state and municipal boards of health, and shall, under the direction of the Secretary of the Treasury, coöperate with and aid state and municipal boards of health in the execution and enforcement of the rules and regulations of such boards and in the execution and enforcement of the rules and regulations made by the Secretary of the Treasury, to prevent the introduction of contagious or infectious diseases into the United States from foreign countries, and into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia; and all rules and regulations made by the Secretary of the Treasury shall operate uniformly and in no manner discriminate against any port or place; and at such ports and places within the United States as have no quarantine regulations under state or municipal authority, where such regulations are, in the opinion of the Secretary of the Treasury, necessary to prevent the introduction of contagious or infectious diseases into the United States from foreign countries, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, and at such ports and places within the United States where

Nor do we find anything in the rules and regulations adopted by the Secretary of the Treasury in execution of the power conferred upon him by the act in question giving support to the contention based upon them. It follows from what has been said that the Supreme Court of Louisiana did not err in deciding that the act in question was not repugnant to the Constitution of the United States, and was not in conflict with the acts of Congress or the treaties made by the United States which were relied upon to show to the contrary and its judgment is, therefore,

*Affirmed.*

MR. JUSTICE BROWN, with whom was MR. JUSTICE HARLAN, dissenting.

The power of the several States, in the absence of legislation by Congress on the subject, to establish quarantine regulations, to prohibit the introduction into the State of persons infected

---

quarantine regulations exist under the authority of the State or municipality which, in the opinion of the Secretary of the Treasury, are not sufficient to prevent the introduction of such diseases into the United States, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, the Secretary of the Treasury shall, if in his judgment it is necesary and proper, make such additional rules and regulations as are necessary to prevent the introduction of such diseases into the United States from foreign countries, or into one State or Territory or the District of Columbia from another State or Territory or the District of Columbia, and when said rules and regulations have been made they shall be promulgated by the Secretary of the Treasury and enforced by the sanitary authorities of the States and municipalities, where the state or municipal health authorities will undertake to execute and enforce them; but if the state or municipal authorities shall fail or refuse to enforce said rules and regulations the President shall execute and enforce the same and adopt such measures as in his judgment shall be necessary to prevent the introduction or spread of such diseases, and may detail or appoint officers for that purpose. The Secretary of the Treasury shall make such rules and regulations as are necessary to be observed by vessels at the port of departure and on the voyage, where such vessels sail from any foreign port or place to any port or place in the United States, to secure the best sanitary condition of such vessel, her cargo, passengers and crew, which shall be published and communicated to and enforced by the consular officers of the United States."

with disease, or recently exposed to contagion, and to impose a reasonable charge upon vessels subjected to examination at quarantine stations, is so well settled by repeated decisions of this court as to be no longer open to doubt. This case, however, does not involve that question, but the broader one, whether, in the assumed exercise of this power, the legislature may declare certain portions of the State to be in quarantine, and prohibit the entry therein of *all* persons whatsoever, whether coming from the United States or foreign countries, from infected or uninfected ports, whether the persons included are diseased or have recently been exposed to contagion, or are perfectly sound and healthy, and coming from ports in which there is no suspicion of contagious diseases.

I have no doubt of the power to quarantine all vessels arriving in the Mississippi from foreign ports for a sufficient length of time to enable the health officers to determine whether there are among her passengers any persons afflicted with a contagious disease. But the State of Louisiana undertakes to do far more than this. It authorizes the state Board of Health at its discretion to "prohibit the introduction into any infected portion of the State of persons acclimated, unacclimated or said to be immune, when in its judgment the introduction of said persons would add to or increase the prevalence of the disease;" and at its meeting on September 29, 1898, the Board of Health adopted the following resolution:

"That hereafter, in the case of any town, city or parish of Louisiana being declared in quarantine, no body or bodies of people, immigrants, soldiers or others shall be allowed to enter said town, city or parish so long as said quarantine shall exist, and that the president of the board shall enforce this resolution."

In other words, the Board of Health is authorized and assumes to prohibit in all portions of the State which it chooses to declare in quarantine, the introduction or immigration of all persons from outside the quarantine district, whether infected or uninfected, sick or well, sound or unsound, feeble or healthy; and that, too, not for the few days necessary to establish the sanitary *status* of such persons, but for an indefinite and possi-

bly permanent period. I think this is not a necessary or proper exercise of the police power, and falls within that numerous class of cases which hold that States may not, in the assumed exercise of police power, interfere with foreign or interstate commerce.

The only excuse offered for such a wholesale exclusion of immigrants is, as stated by the Supreme Court, "to keep down, as far as possible, the number of persons to be brought within danger of contagion or infection, and by means of this reduction to accomplish the subsidence and suppression of the disease, and the spread of the same." In other words, the excuse amounts to this: that the admission, even of healthy persons, adds to the possibility of the contagion being communicated upon the principle of adding fuel to the flame. It does not increase the danger of contagion by adding infected persons to the population, since the bill avers that all the immigrants were healthy and sound. All it could possibly do is to increase the number of persons who might become ill if permitted to be added to the population. This is a danger not to the population, but to the immigrants. It seems to me that this is a possibility too remote to justify the drastic measure of a total exclusion of all classes of immigrants, and that the opinion of the court is directly in the teeth of *Railroad Company* v. *Husen*, 95 U. S. 465, wherein a state statute, which prohibited the driving or conveying of any Texas, Mexican or Indian cattle into the State, between March 1 and November 1 in each year, was held to be in conflict with the commerce clause of the Constitution. Such statute was declared to be more than a quarantine regulation, and not a legitimate exercise of the police power of the State. Said Mr. Justice Strong, page 472: "While we unhesitatingly admit that a State may pass sanitary laws, and laws for the protection of life, liberty, health or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, etc., from entering the State; while for the purpose of self-protection it may establish quarantine and reasonable inspection laws, it may not interfere with the transportation into or through the State, beyond what is absolutely necessary

for its self-protection. It may not under the cover of exerting its police powers substantially prohibit or burden either foreign or interstate commerce." The statute was held to be a plain intrusion upon the exclusive domain of Congress; that it was not a quarantine law; not an inspection law, and was objectionable because it prohibited the introduction of cattle, no matter whether they may do an injury to the inhabitants of a State or not; " and if you do bring them in, even for the purpose of carrying them through the State without unloading them, you shall be subject to extraordinary liabilities." Cases covering the same principle are those of *State* v. *Steamship Constitution*, 42 Cal. 578, and *City of Bangor* v. *Smith*, 83 Maine, 422.

I am also unable to concur in the construction given in the opinion of the court to the treaty stipulation with France and other foreign powers. The treaty with France of 1803 provides that " the ships of France shall be treated upon the footing of the most favored nation in the ports above mentioned " of Louisiana. Article 14 of the treaty with Greece of December 22, 1837, set forth in the opinion, provides that vessels arriving directly from the Kingdom of Greece at any port of the United States of America, "and provided with a bill of health granted by an officer having competent power to that effect, at the port whence such vessel shall have sailed, setting forth that no malignant or contagious diseases prevailed in that port, shall be subjected to no other quarantine than such as may be necessary for the visit of the health officer of the port where such vessel shall have arrived, after which said vessels shall be allowed immediately to enter and unload their cargoes: *Provided always*, That there shall be on board no person who, during the voyage, shall have been attacked with any malignant or contagious disease; that such vessel shall not, during the passage, have communicated with any vessel liable itself to undergo quarantine, and that the country whence they came, shall not at that time be so far infected or suspected that, before their arrival, an ordinance had been issued, in consequence of which, all vessels coming from that country should be considered as suspected, and consequently subject to quarantine."

If the law in question in Louisiana, excluding French ships from all access to the port of New Orleans, be not a violation of the provision of the treaty that vessels "shall be subject to no other quarantine than such as may be necessary for the visit of a health officer of the port, after which such vessels shall be allowed immediately to enter and unload their cargoes," I am unable to conceive a state of facts which would constitute a violation of that provision. Necessary as efficient quarantine laws are, I know of no authority in the States to enact such as are in conflict with our treaties with foreign nations.