IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2000 Session

## BILLY HEMBREE, JR., ET AL. v. STATE OF TENNESSEE
### Appeal from the Tennessee Claims Commission
### No. 201295

### No. M2000-00767-COA-R3-CV - Filed May 30, 2001

Lester Peavyhouse, having been found not guilty by reason of insanity after an April 1985 attack upon his sister with a hatchet, was committed by the Circuit Court of Stewart County to the Middle Tennessee Mental Health Institute ("MTMHI") in Nashville for involuntary care and treatment on March 1, 1988. In January 1989, he was transferred from MTMHI to Luton Community Mental Health Center subject to a mandatory outpatient therapy plan. In July 1989, he was transferred to Vanderbilt Mental Health Center Adult Outpatient Services section. Ultimately, Peavyhouse enrolled as a student at Austin Peay State University with out patient therapy through Harriet Cohn Center in Clarksville. On October 31, 1991, Peavyhouse entered a private residence in Clarksville with a .410 gauge shotgun and shot to death Misty Harding and Billy Hembree, seriously wounded David Ross and Robert Huff, and committed aggravated assaults upon Charity Baggett, Deanna Shepherd, Walter Scott Palmer, and Jeffery Underwood. Peavyhouse was convicted on all charges and sentenced to two consecutive life terms in prison plus fifty-six years.[1] The estates of Harding and Hembree, together with the other victims of the October 31, 1991 assaults, brought suit against the State of Tennessee before the Tennessee Claims Commission charging MTMHI with negligence in the January 23, 1989 release of Peavyhouse from a secure treatment facility. The Tennessee Claims Commission rendered judgment in favor of the claimants and the State of Tennessee Appeals. We affirm the judgment of the Claims Commission.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims Commission Affirmed

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J.,M.S., and WILLIAM C. KOCH, JR., J., joined.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Michael W. Catalano, Associate Solicitor General and David T. Whitefield, Senior Counsel, Nashville, Tennessee, for the appellant, State of Tennessee.

William B. Raiford, III, Clarksdale, Mississippi, for the appellees, Billy D. Hembree, Sr., and Sharon Hembree, Wrongful Death Beneficiaries and Natural Parents of Billy Hembree, Jr., Deceased; Richard Harding and Kathryn Harding, Wrongful Death Beneficiaries and Natural Parents of Misty Harding, Deceased; Robert L. Huff, Jr., and David Ross.

---

[1] Mr. Peavyhouse committed suicide while incarcerated on these sentences.

# OPINION

Much of the history of this case can be gleaned from the previous opinion of this Court, reversing summary judgment for the State by the Claims Commission and the opinion of the Supreme Court of Tennessee, sustaining this Court as reported in *Hembree v. State*, 925 S.W.2d 513 (Tenn. 1996). Further enlightenment is evidenced by *State of Tennessee v. Peavyhouse,* C.C.A. No. 01C01-9409-CC-00307, 1996 WL 129840 (Tenn. Crim. App. Mar. 22, 1996).

After the hatchet assault upon his sister, Peavyhouse was committed to Middle Tennessee Mental Health Institute ("MTMHI") by the Circuit Court of Stewart County under the provisions of Tennessee Code Annotated section 33-7-301(a) on September 26, 1985. His prior history is set forth in detail in the interview findings and staff conference report from the Forensic Services Division ("FSD") of MTMHI under date of October 18, 1985.

> Lester Peavyhouse, a 33-year-old divorced white male, was admitted to the Forensic Services Division of Middle Tennessee Mental Health Institute on September 6, 1985 from the Stewart County Circuit Court pursuant to the provisions of T.C.A. 33-7-301(a). This was his fourth admission to MTMHI. He is charged with Assault with Intent to Commit Murder. Following medical, psychological, and psychiatric examinations he was staffed on October 4, 1985.

> Mr. Peavyhouse is alleged to have attacked his sister with a hatchet during a family argument. Regarding the alleged incident, Mr. Peavyhouse related that he had recently returned from Duluth, Minnesota where he had been incarcerated for second degree assault. On the day of the alleged offense, Mr. Peavyhouse reportedly was telling his brother and his brother's girlfriend about having been threatened in the Duluth jail. According to Mr. Peavyhouse, his brother's girlfriend stated "you can't fight the Mafia". Reportedly Mr. Peavyhouse became extremely angry over that statement, ordered them to leave, and started smashing up the furniture with the hatchet. Mr. Peavyhouse stated that his sister got in his way and he hit her in the head accidentally.

> According to information in the social history, Mr. Peavyhouse first came to the attention of the court in August, 1972, when he was charged with flag desecration. After four months of incarceration he was transferred to MTMHI where he remained from December 12, 1972 until May 24, 1973. His discharge diagnoses were Acute Schizophrenic Reaction (in remission) and Drug Dependence, hallucinogens (in remission). He was arrested in November, 1977 for assault with intent to commit murder. Mr. Peavyhouse was evaluated at FSD in connection with that charge and was found competent to stand trial, not judicially committable, with no support for an insanity defense. He was diagnosed at that time as Paranoid Personality. He was returned to FSD for further evaluation because his attorney felt that he was incompetent; however, the recommendations and diagnoses remained the same. In

-2-

September, 1978, he pled guilty as part of a plea bargain agreement and was given time served plus three years probation. Since his last admission to MTMHI in 1978, Mr. Peavyhouse has been seen at Harriet Cohn and Plateau Mental Health Centers. His arrest record since that time reflects numerous brief incarcerations for such offenses as assault, criminal trespassing, malicious mischief, disorderly conduct, and violation of probation. Most recently, he was charged with second degree assault in Duluth, Minnesota, after he reportedly stabbed a man who refused him admission to a shelter. While in jail, Mr. Peavyhouse reportedly got into a fight with another inmate and received additional charges. Although an insanity defense was supported in that case, Mr. Peavyhouse's attorney reportedly advised him to plea bargain and he was placed on probation for two years. He returned to Tennessee from Minnesota in March, 1985.

During his current stay at FSD, Mr. Peavyhouse has been very paranoid and delusional. His delusional system is extensive and involves his brother, his defense attorney, the sheriff and staff at the Stewart County Jail, and some staff members at FSD. His affect has been labile and frequently inappropriate to his thought content. During interviews, he repeatedly stated that he heard people talking about him in the hall and that staff members and other patients were conspiring to have him killed. He asked on several occasions for permission to contact the TBI because he overheard his female attorney being beaten and raped while he was in jail. He appeared to be terrified of returning to the jail in Stewart County and asked repeatedly to be sent to another jail upon his release from FSD. He stated that while he was in jail he heard his brother telling the sheriff to beat him up and reported that the sheriff thought he was Hitler and they (the sheriff's department staff) were going to hang him. Psychological testing indicated that Mr. Peavyhouse is functioning in the upper limits of the average range of intellectual ability. The Bender protocol contraindicated the presence of organicity or brain damage. MMPI data were suggestive of a suspicious, evasive, and defensive individual who presents such symptoms as ideas of reference, delusions, emotional lability, and anxiety. The results of psychological testing, in conjunction with Lester's behavior on the ward and during interviews, are consistent with a diagnosis of paranoid schizophrenia.

It was determined that at the time of the alleged offense, Mr. Peavyhouse was exhibiting Chronic Paranoid Schizophrenia, which is a severe mental illness characterized by delusions and hallucinations of a grandiose and persecutory nature. As a result of his severe mental illness, Mr. Peavyhouse's capacity to appreciate the wrongfulness of the alleged offense was substantially impaired as was his capacity to conform his conduct to the requirements of the law. Therefore, the forensic findings can support a defense of insanity pursuant to Graham vs. State (1977).

It was also concluded that Mr. Peavyhouse is not mentally competent to stand trial at this time. Although he has an adequate understanding of judicial procedure, his

extensive delusional system would prevent him from consulting meaningfully with his attorney or participating in his own defense. He is in need of chemotherapy to restore his mental competence.

Mr. Peavyhouse meets the requirements for judicial commitment pursuant to T.C.A. 33-7-301(b) and 33-6-104 in that he is not competent to stand trial and is suffering from a mental illness directly resulting in his being harmful to himself and to others. Since little improvement has been noted during his stay at FSD, it is recommended that treatment be continued in a secure facility.

It is recommended that, due to the serious nature of his mental illness, Mr. Peavyhouse should remain hospitalized at MTMHI-FSD until his judicial commitment hearing. His return to jail at this time is contraindicated due to his psychiatric condition.

RECOMMENDATIONS:

1. Not mentally competent to stand trial;
2. Can support a defense of insanity.

Peavyhouse was diagnosed on October 18, 1985 as "Axis I: Paranoid Schizophrenia, Chronic 295.32."

After treatment, MTMHI staff determined in June 1986 that Mr. Peavyhouse could be moved to the less secure civil side of the facility and he was transferred to the civil side on July 15, 1986. From this less secure facility, Peavyhouse twice "eloped" (escaped). Once again, the Circuit Court of Stewart County ordered him readmitted to secure facility on November 25, 1986. On February 17, 1987, the treatment team decided Peavyhouse was competent to stand trial. At the trial on March 25, 1987, the Stewart County Circuit Court found Peavyhouse not guilty of the assault upon his sister by reason of insanity at the time of the crime and the court returned him to the FSD of MTMHI for mandatory diagnosis and evaluation pursuant to Tennessee Code Annotated section 33-7-303(a). Following this diagnosis and evaluation, Peavyhouse was committed to the custody of MTMHI for involuntary treatment of his mental illness. This was done on order of the Circuit Court of Stewart County on March 1, 1988 when, after a hearing, the court found "by clear, unequivocal and convincing evidence that the respondent is mentally ill and, because of this illness, poses a likelihood of serious harm, and all available less drastic alternatives to commitment to a mental hospital or treatment resource are unsuitable."

At that time, Peavyhouse was diagnosed as suffering from two conditions: (1) Axis I Paranoid Schizophrenia and (2) Axis II Schizoid Personality Disorder.

At the time of his January 23, 1989 discharge by MTMHI, it is the insistence of the State that his Axis I Paranoid Schizophrenia was in remission, his Axis II Schizoid Personality Disorder was

not a "mental illness" within the meaning of Tennessee Code Annotated section 33-6-109(b), and that his discharge from involuntary secure confinement was mandated by due process of law considerations.

This decision of January 29, 1989 and the "outpatient only" treatment of Peavyhouse thereafter presents the decisive issue in this case.

Following the events of October 31, 1991, the Claims Commission dismissed the case on motion of the State finding that it lacked subject matter jurisdiction of a case involving a "former" mental patient at a state facility because such persons are not "persons in the care, custody and control" of the state as the statute requires. On appeal, this Court reversed the Commissioner's judgment holding that he construed the jurisdictional statute (T.C.A. § 9-8-307(a)(1)(E)) too narrowly. The Supreme Court then granted the appeal of the State but affirmed the decision of this Court holding "[h]owever, as did the Court of Appeals in its well-reasoned opinion, we conclude that confinement in the literal sense is not necessarily a prerequisite to the invocation of the Claims Commission's jurisdiction under Tenn. Code Ann. § 9-8-307(a)(1)(E)." *Hembree v. State*, 925 S.W.2d 513, 515 (Tenn. 1996).

In holding that the Claims Commission had erred in granting summary judgment to the State, the Supreme Court held:

> The state is responsible for the proper care and control of patients within its mental health facilities. See Tenn.Code Ann. § 33-6-109(b), (c) (Supp. 1995) (discharge criteria). This responsibility extends to the "release" decision; that is, the decision to release a patient into the community. This decision, if negligently made, may expose the State to liability. Such a construction is consonant with the legislature's expressed intent that such decision be made carefully and cautiously.
> . . . .
> In the case before us, the claimants charge that the state was negligent in its decision to release Peavyhouse. At the time he was released, Peavyhouse was clearly within the "care, custody and control" of the state because, as the intermediate court correctly noted, "[r]elease decisions can only involve persons who are in the State's care, custody and control." 1995 WL 50066, slip op. at 8. Moreover,
>
>> [e]xcept for several circumstances not applicable here, state officials have authority over the confinement of these individuals and exercise their professional judgment concerning the conditions of confinement and release from custody. Decisions to release or to relax or extend the conditions of confinement relate directly to the care, custody, and control of these inmates or patients. If made negligently, these decisions could result in injury or harm not [only] to the inmate or patient but also to [others]. *Id.*

> Because the alleged negligence arises out of acts or omissions which were alleged to have occurred at a time when Peavyhouse was clearly within the "care, custody and control" of the state, the claimants have stated a cause of action upon which relief can be granted; the Commission clearly has jurisdiction over this claim.

*Id.* at 517-18 (footnote ommitted).

The case was remanded for trial to the Tennessee Claims Commission and on February 29, 2000, Commissioner W. R. Baker issued a thirty-eight page memorandum finding the state negligent in the release of Lester Peavyhouse.

The Commission summarized:

1.    MTMHI negligently overlooked T.C.A. § 36-6-202(d)(4) about giving notice of the Mandatory Outpatient Treatment plan to the committing Court, and disregarded the Mental Health and Mental Retardation Department's "Community Mental Health Standards" about tracking and monitoring MOT plans.

2.    MTMHI negligently gave no consideration whatever to balancing patients' interest in deinstitutionalization against the public's interest in keeping dangerous people confined.

3.    MTMHI knew that Peaveyhouse was dangerous and negligently released him anyhow. MTMHI negligently disregarded Peaveyhouse's ("Axis II") personality disorder, a certified mental illness, both in its treating him and in its release decisions. MTMHI knew Peaveyhouse was a bright and manipulative liar, and it still negligently based some of its crucial decisions about his treatment and release on his own statements. MTMHI negligently sent only five pages of Peaveyhouse's records to his "aftercare providers"; MTMHI negligently told Luton Center and Vanderbilt nothing about Peaveyhouse's history of violence or his history of avoiding his medication, so that they were left to guess at what they needed information about and left to scratch to get it.

4.    Worst of all, MTMHI's whole philosophy about Peaveyhouse's treatment was negligent, mainly because of its mindless devotion to deinstitutionalization. Dr. Bernet said, "Our society has pushed to has (*sic*) patients like this living in the community... Unfortunately sometimes these patients... do things that are dangerous or violent; I think we can live with that..." But this statement is not true: our society has not pushed to have patients like this living in the community, and the law (as shown in §§315 and 319 of the Restatement 2nd of Torts, cited in Judge Koch's opinion in this

claim) says otherwise. Nobody wants people like Peaveyhouse "living in the community" except an elite who are particularly concerned with mental illness like Dr. Okpaku and Dr. White. As Judge Koch said, returning admittedly dangerous people to the community is inconsistent with public policy and good sense.

The Commission finds that the decisions to release Peaveyhouse were made negligently and did result in serious injury and harm to the public (and that Peaveyhouse himself was ill-served by wrongful deinstitutionalization). The Commission finds that in this claim the State is guilty of "Negligent care, custody, and control of persons," namely, Lester Peaveyhouse.

Our standard of review of the findings of fact by the Commissioner is established by Rule 13(d) of the Tennessee Rules of Appellate Procedure providing: "Unless otherwise required by statute, review of the findings of fact of the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." No presumption of correctness attaches to the trial court's conclusions of law. *Tennessee Farmers Mutual Ins. Co. v. Moore*, 958 S.W.2d 759 (Tenn. Ct. App. 1997).

Also, "[i]t is well settled that 'the weight, faith and credit to be given any witnesses' testimony lies in the first instance with the trier of fact who has the opportunity to observe the manner and demeanor of the witnesses as they testify' " and the credibility of witnesses accorded by the trial judge is given great weight on appeal. *Doe A. v. Coffee County Bd. of Educ.*, 925 S.W.2d 534, 537 (Tenn. Ct. App. 1996) (citing *Koch v. Koch*, 874 S.W.2d 571, 577 (Tenn. Ct. App. 1993)).

After Peavyhouse assaulted his sister with a hatchet, he was examined by physicians at MTMHI and the Circuit Court of Stewart County was informed that an insanity defense could be supported. After trial, in which physicians from MTMHI testified in support of the insanity defense, Peavyhouse was found not guilty by reason of insanity. After this finding, Peavyhouse was subjected to an involuntary commitment proceeding in which MTMHI physicians testified that he was subject to involuntary commitment in accordance with Tennessee Code Annotated section 33-6-104. Following this hearing, the Circuit Court for Stewart County, Tennessee found by clear, unequivocal and convincing evidence that Peavyhouse was mentally ill and because of such mental illness, posed a likelihood of serious harm and all less drastic alternatives to commitment to a mental hospital were unsuitable. In diagnosis at MTMHI he was found to suffer from (1) Axis I Paranoid Schizophrenia and (2) Axis II Schizoid Personality Disorder.

Commitment having been ordered on these findings by the trial judge, future discharge of Mr. Peavyhouse was subject to the provisions of Tennessee Code Annotated section 33-6-109. This statute provides that the patient is entitled to be discharged if (1) he is no longer mentally ill or (2) his mental illness is in remission and he does not pose a likelihood of serious harm.

In support of Peavyhouse's discharge pursuant to Tennessee Code Annotated section 33-6-109, on January 23, 1989, the State asserts first that his Axis I Paranoid Schizophrenia was in remission and second, that his Axis II Schizoid Personality Disorder did not constitute "mental illness" and under such conditions, failure to discharge Peavyhouse would be in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States under the holding of the United States Supreme Court in *Foucha v. Louisiana*, 504 U.S. 71 (1991). Reliance on *Foucha* is misplaced if the Axis I Paranoid Schizophrenia was not in remission or if the Axis II Schizoid Personality Disorder is a "mental illness" within the meaning of the discharge criteria for persons who are "mentally ill" as provided by Tennessee Code Annotated section 33-6-109.

In the *Foucha* case, the state was attempting an involuntary civil commitment because the defendant was potentially dangerous while admitting that he was not mentally ill. In the case at bar, Plaintiffs have alleged and the Claims Commission has held that Peavyhouse was not in remission of his Axis I Paranoid Schizophrenia and that his admittedly continuing Axis II Schizoid Personality Disorder was a mental illness within the meaning of the involuntary commitment statutes. The decisive question is whether or not the evidence preponderates against the findings of the Claims Commission on both of these findings. We hold that it does not.

According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (1995): "A personality disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of an individual's culture, is pervasive and inflexible, has onset in adolescence or early childhood, is stable over time, and leads to distress or impairment."

Thus is defined the Axis II Schizoid Personality Disorder that afflicted Peavyhouse. This condition, which was supported by all of the medical testimony, continued to exist until the day he died.

That same authority defines his Axis I condition: "Schizophrenia is a disturbance that lasts for at least six months and includes at least one month of active-phase symptoms (i.e. two or more of the following: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, negative symptoms)."

No where in the Tennessee statutes dealing with involuntary commitment or release from involuntary commitment is the term "mental illness" defined. In seeking to distinguish Axis I and Axis II, the state's expert, Dr. Kwentus, agreed with the Claims Commissioner's assertion that the difference between an Axis I type of clinical disorder and an Axis II type personality disorder was that in Axis I, the subject was "crazy" and in Axis II, the subject was "damn mean."

The position of the state that the Axis II condition is "untreatable" is meaningless in both a constitutional and statutory context.

The United States Supreme Court has held:

While we have upheld state civil commitment statutes that aim both to incapacitate and to treat, see *Allen, supra*, we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. A State could hardly be seen as furthering a "punitive" purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease. Accord, *Compagnie Francaise de Navigation a Vapeur v. Louisiana Bd. of Health*, 186 U.S. 380, 22 S.Ct. 811, 46 L.Ed. 1209 (1902) (permitting involuntary quarantine of persons suffering from communicable diseases). Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions. Cf. *Greenwood v. United States*, 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956) ("The fact that at present there may be little likelihood of recovery does not defeat federal power to make this initial commitment of the petitioner"); *O'Connor v. Donaldson*, 422 U.S. 563, 584 95 S.Ct. 2486, 2498, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring) ("[I]t remains a stubborn fact that there are many forms of mental illness which are not understood, some which are untreatable in the sense that no effective therapy has het been discovered for them, and that rates of 'cure' are generally low").

*Kansas v. Hendrix*, 521 U.S. 346, 366 (1997).

The controlling question is whether or not the Axis II condition is a "mental illness" (treatable or untreatable - - curable or incurable) within the meaning of the Tennessee Involuntary Civil Commitment Statutes.

Not only does the expert proof offered by the claimants establish a sound foundation for the Claims Commission holding that an Axis II condition is a "mental illness," but such finding is clearly supported by the testimony on cross-examination of the State's own expert, Dr. Burnett. He testified:

Q.  [By Mr. Raiford] All right, well, let's move forward then, Doctor. Do you agree with Dr. Okpaku's Axis 2 diagnosis with respect to Lester Peavyhouse?
A.  Well, I'd have to look and see what it is.
Q.  Well, you testified about it earlier. You referred to it in your notebook. It is the schizoid personality disorder?
A.  Right. That's what he said on his discharge summary. Well, I agree that Mr. Peavyhouse had some kind of personality disorder. And different records talk about his being paranoid, schizoid or perhaps anti-social.
I'm not - - probably the best label is what's just called the mixed personality disorder with different features. In other words, I guess on the information that I have I would say he definitely had a

-9-

personality disorder, and that I would probably call it a mixed personality disorder with paranoid, antisocial and schizoid features.

Q. Do you agree that a schizoid personality disorder is a mental illness?

A. Well, not - - it depends on how you use the term. It is a mental illness in the sense that it's in the list of diagnosis that are used in psychiatry, the diagnostic and statistical manual. However, it is not a mental illness in certain legal settings. . . .

. . . .

Q. Well, we'd have to look at the specific law to know the context in which it is used. But schizoid personality disorder is a recognized mental illness, recognized by psychiatry as a mental illness, is it not?

A. It is a psychiatric term that identifies a mental illness in a psychiatric context.

Q. And you use the term the diagnostic manual. What's the proper word for that?

A. The full name is the Diagnostic And Statistical Manual, and it's currently called the fourth Edition.

Q. And who compiles that?

A. It's put out by the American Psychiatric Association.

Q. Is that a national association or organization of psychiatrists?

A. Yes, it is.

Q. Is that the foremost organization of psychiatrists in the United States?

A. Yes, it is.

Q. Are you a member of that organization?

A. Yes.

Q. And if we wanted to go and find schizoid personality disorder, we could find that illness in that manual?

A. Yes.

Q. Could we find paranoid personality disorder in that manual?

A. Yes.

. . . .

Q. Could we find mixed personality disorders in that manual?

A. Yes.

Q. Are you of the opinion that Mr. Peavyhouse was cured of his schizoid personality disorder at the time of his discharge in January of 1989?

A. No, I don't think he was.

Q. That was still present, was it not?

A. Well, some form of personality disorder was still present.

Q. And not all personality disorders are the same, but in Mr. Peavyhouse's case, his personality disorder made him potentially violent and dangerous, did it not?

A. Yes.

. . .

Q.     Well, particularly in his case where we have numerous, repeated, violent assaults, you would say that he is a substantial risk if he is released into the community of doing further violence at some point in time, would you not?

A.     Yes, I think that he had a number of illegal acts, even in jail several times. And mental patients who have been antisocial and have been in jail a number of times are likely to end up in jail again.

Q.     You would agree that at the time Mr. Peavyhouse was discharged in 1989 it would have been reasonable to say that there was a likelihood that he would commit further violence in the future?

A.     Well, I've already said that, that there was some likelihood. . . .

The finding of the Claims Commission that the Axis II condition suffered by Peavyhouse at the time of his release on January 29, 1989 was a "mental illness" is fully supported by the record in this case and certainly the evidence does not preponderate against the findings of the Claims Commission in this respect.

The record, and particularly the expert testimony offered in the case, supports the findings of the Claims Commission that the Axis I condition, Paranoid Schizophrenia, which the State concedes is a mental illness, was not in remission at the time of the January 29, 1989 release of Peavyhouse.  In this respect, Plaintiff's expert, Dr. Reisman, testified:

Q.     [By Mr. Raiford] Doctor, you have heard Mr. Whitefield's opening statements that Mr. Peavyhouse made a systematic improvement in his condition during the time he was admitted to MTMHI and was an appropriate candidate for release at the time he was released in January 1989.  Do you agree with those assertions?

A.     No, I don't.
         . . . .

Q.     Doctor, in your opinion, was Mr. Peavyhouse still mentally ill at the time he was discharged from MTMHI in January of 1989?

A.     Yes, he was.

Q.     And in what respect?

A.     Well, he continued to be a paranoid schizophrenic.  He remained delusional
         . . . .

Q.     Doctor, in your opinion in January of 1989 when Mr. Peavyhouse was released, did he pose a substantial likelihood of serious harm to either himself or others in the community?

A.     Yes, he did.
         . . . .

Q.     In your opinion, Doctor, was voluntary outpatient therapy a suitable, less drastic alternative for the treatment of Lester Peavyhouse in January of 1989?

A.     Not for Lester Peavyhouse.

Q.     Why not?

A.     Well, as I say, he still was not in remission from his illness. And the man's behavior still indicated a high threat of dangerous behavior.

On cross-examination, the State's expert witness, Dr. Kwentus, testified:

Q.     [By Mr. Raiford] Were you aware from the records that Mr. Peavyhouse was delusional within a few weeks of the time he was discharged?
A.     Yes.
Q.     Were you aware that after he was discharged he was regarded as one of Luton's most difficult aggressive patients?
A.     Yes, I was.
Q.     In your opinion does that indicate a patient who does not have a - - well, whose mental illness is in remission and who has been adequately treated at the time of discharge?
A.     His mental illness was in remission in the sense that if you compared how he was at the time of discharge and how he was when he was admitted, he was substantially improved. He obviously needed ongoing treatment and would need ongoing treatment for the rest of his life. There is no way that he would be discharged without needing ongoing treatment. . . .
       . . . .
Q.     You are aware from the review of the records that even up to the time of discharge, Mr. Peavyhouse was paranoid, delusional, assaultive, aggressive, unwilling to cooperate with the staff, and some evidence that he was not able to understand his mental illness, he had poor insight, poor judgment, and refused to cooperate with his discharge planning?
A.     Some of the things I would agree with. It was quite a long list. So I don't know I would agree with every statement you made, but a lot of the things that you said I would agree with.
       . . . .
Q.     Well you agree that Mr. Peavyhouse has a number of very, very serious assaultive behaviors that are noted even in your own report?
A.     There is absolutely no doubt about it.
Q.     [In] Dr. Reason's (sic) words, this was, quote, a bad dude wasn't it?
A.     He could be.
Q.     And he certainly if released to the community could pose a very substantial and real danger to people around him, could he not?
A.     He had that potential. I think that's just self-evident from his past that he had a potential for causing harm to people.

The Commissioner heard the testimony of all of the experts, both on direct examination and cross-examination. The record reflects that the experts for the State on direct examination strongly supported the decision of MTMHI in the release to outpatient care of Peavyhouse on January 29, 1989. The Commissioner judged the strengths and weaknesses of the testimony for all parties and

judged the credibility of the witnesses, which is both his prerogative and his duty with his credibility judgments entitled to much weight in this Court. *Koch v. Koch*, 874 S.W.2d 571 (Tenn. Ct. App. 1993). The evidence does not preponderate against the finding of the Claims Commission that the Axis I Paranoid Schizophrenia mental illness of Peavyhouse was not in remission at the time of the January 29, 1989 release.

The State argues that the length of time elapsing between the release of Peavyhouse on January 29, 1989 and the events of October 31, 1991 renders his acts of the latter date not reasonably foreseeable and, thus, not a proximate cause of the October 31, 1991 tragedy.

This argument is without merit as all one really has to do is look to the October 18, 1985 staff conference report of MTMHI itself and the testimony of all the medical experts to reasonably foresee that Peavyhouse was a time bomb waiting to explode.

"The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred." *McClenahan v. Cooley*, 806 S.W.2d 767,775 (Tenn. 1991) (citing *Roberts v. Robertson County Bd. of Ed.*, 692 S.W.2d 863, 871 (Tenn. Ct. App. 1985); *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d 276, 280-81 (Tenn. Ct. App. 1977)).

The State further argues that the Claims Commission erred in holding that the State had care, custody and control over Peavyhouse after his release of January 29, 1989 from MTMHI care to non-state community mental health centers.

This holding of the Claims Commission is immaterial to the outcome of the case. The claimants allege first and foremost that the decision of January 29, 1989 to release Peavyhouse into outpatient care was a negligent decision proximately causing the tragedy of October 31, 1991. In the previous appeal of this case, the Supreme Court held: "This responsibility extends to the 'release' decision; that is, the decision to release a patient into the community. This decision, if negligently made, may expose the State to liability." *Hembree v. State*, 925 S.W.2d 513, 517 (Tenn. 1996). After hearing all of the evidence the Claims Commission held that the "release" decision was a negligent decision and proximately caused the October 31, 1991 events. The evidence does not preponderate against the decision of the Claims Commission in this respect as both the Court of Appeals and the Supreme Court in the previous appeal held: "At the time he was released, Peavyhouse was clearly within the 'care, custody and control' of the state because, as the intermediate court correctly noted '[r]elease decisions can only involve persons who are in the State's care, custody and control.' " *Id.* (citing 1995 WL 50066, slip op. at 8).

Much of the other argument by the State asserts the State's lack of responsibility for Peavyhouse after its decision to release him from secure facility on January 29, 1989. The Claims Commission held that MTMHI was negligent in its failure to inform outpatient treatment facilities

of the history and dangerous propensities of Peavyhouse.  While unnecessary to the decision in this case, the record fully supports the finding of the Claims Commission in this respect.

In a strange paradox, the State asserts through the clinical director, Dr. Jackson B. White, and the coordinator at MTMHI, Lynn McDonald, that once the decision is made to release a patient to outpatient therapy, MTMHI has no further responsibility and, in effect, washes its hands of the patient.  On the other hand, when confronted by indisputable evidence that subsequent to his release to outpatient care, Peavyhouse had pulled a knife and threatened co-workers at Vanderbilt, Dr. Jackson White testified:

> Q. [By Mr. Raiford] Do you recall when I took your deposition I asked you about an incident that occurred at Vanderbilt during the time Mr. Peavyhouse was being seen and treated by Vanderbilt?
> A. Uh-huh, yes.
> Q. He pulled a knife on someone?
> A. You described it to me.
> Q. Do you recall what your response was when I asked you what you would have done had you been notified of that?
> A. Had we been notified by the treating physician professional that Lester needed to come back to the hospital we would have taken him immediately. I believe that is what I told you.
> Q. Are you aware of what information, if any, Vanderbilt had with regard to Mr. Peavyhouse's prior violent history or acts?
> A. No.
>     . . . .
> Q. . . . Question:  My question to you was if you were aware of that information what would this facility have done?
>     Answer: We would recommend bringing him right here with one certificate and we would have filled out the other certificate.  He would have been admitted in a heartbeat.
>     . . . .
> A. That's true.

The evidence certainly does not preponderate against the finding of the Claims Commission as to negligence by MTMHI in its failure to properly inform outpatient facilities of the violent history of Peavyhouse and its failure to properly communicate with outpatient treatment facilities to whom it had referred Peavyhouse.

The State insists that the findings of *State v. Peavyhouse*, No. 01C01-9409-CC-00307, 1996 WL 129840 (Tenn. Crim. App. 1996) (determining that Peavyhouse was not insane at the time of the October 31, 1991 crimes for which he was convicted) bars any civil finding of state liability for any negligence relative to the January 29, 1989 release of Peavyhouse or the failure to monitor his outpatient after care.  A finding that Peavyhouse was not insane for purposes of the criminal

proceeding is not equivalent to a finding that he was not mentally ill. Although Peavyhouse was mentally ill, he was found not insane permitting the criminal court to find Peavyhouse guilty of the crimes for which he was convicted. Mental illness and legal insanity are not one in the same. It suffices to say that none of the claimants in this case were legal parties to the criminal action and neither res judicata nor collateral estoppel are applicable to this case. *Hayes v. Civil Service Comm'n of Metro Gov't.*, 907 S.W.2d 826 (Tenn. Ct. App. 1995).

Finally, the State asserts discretionary function governmental immunity. This argument was not raised in the trial court prior to the previous appeal nor raised in the appellate courts on the previous appeal, nor raised in the Claims Commission on remand. It appears for the first time in the appellate brief of the State on the present appeal. "An issue not raised at trial cannot be raised for the first time on appeal." *Mitts v. Mitts*, 39 S.W.3d 142, 146 (Tenn. Ct. App. 2000) (citing *Sparks v. Metropolitan Gov't of Nashville and Davidson County*, 771 S.W.2d 430, 434 (Tenn. Ct. App. 1989)).

The decision of the Claims Commission is in all respects affirmed the case remanded for collection of judgments. Costs on appeal are assessed against the State of Tennessee.

_____
WILLIAM B. CAIN, JUDGE